UNITED STATE DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------x
IBERIA FOODS CORP., NORTH SHORE
BOTTLING CO., INC., BROOKLYN
BOTTLING OF MILTON, NEW YORK, INC.
and INTERNATIONAL WORLD FOODS
CORP.,

                                                     Case No.

        Plaintiffs,

-against-                                    VERIFIED COMPLAINT
                                            AND JURY DEMAND

LATINFOOD U.S. CORP., J. WILSON
INTERNATIONAL, INC. and WILSON ZULUAGA,

        Defendants.
------------------------------------------------------------------x

        Plaintiffs, Iberia Foods Corp., North Shore Bottling Co., Inc., Brooklyn Bottling Of Milton, New York, Inc. and International World Foods Corp. ("Plaintiffs"), bring this action to obtain redress, compensation and injunctive relief for past and ongoing loss and damage sustained as a result of Defendants continued sale of materially different gray market goods displaying the same trademark and trade dress as the authorized goods being sold by Plaintiffs

        Plaintiffs hereby allege the following:

## PARTIES

        1.      Iberia Foods Corp., ("Iberia") is a corporation duly organized and existing under of the laws of the State of Delaware, with its principal place of business at 1900 Linden Boulevard, Brooklyn, New York 11207.

2.      North Shore Bottling Co., Inc. ("North Shore") is a corporation duly organized and existing under of the laws of the State of New York, with its principal place of business at 1900 Linden Boulevard, Brooklyn, New York 11207.

3.      Brooklyn Bottling of Milton, New York, INC. ("BBM") is a corporation duly organized and existing under of the laws of the State of New York, with its principal place of business at South Road, Milton, New York 12547.

4.      International World Foods Corp. ("IWF") is a corporation duly organized and existing under of the laws of the State of Georgia, with its principal place of business at 550 Indian Trail Road, Lilburn, Georgia 30047.

5.      Upon information and belief, defendant Latinfood U.S. Corp. ("Latinfood") is a corporation duly organized and existing under of the laws of the State of New York, with its principal place of business at 80 B Keyland Court, Bohemia, New York 11716.

6.      Upon information and belief, defendant J. Wilson International, Inc. ("J. Wilson") is a corporation duly organized and existing under of the laws of the State of New York, with its principal place of business at 80 B Keyland Court, Bohemia, New York 11716.

7.      Upon information and belief, defendant Wilson Zuluaga ("Zuluaga") is an individual residing in the State of New York with an address at 80 B Keyland Court, Bohemia, New York 11716. (Latinfood, J. Wilson and Zuluaga collectively referred to hereon as "Defendants").

8.      Upon information and belief, Defendants have acted in a collective manner to commit acts in violation of the Lanham act, 15 U.S.C. §1051 et. seq, as well as state common law unfair competition, tortious interference with prospective economic advantage and violations of New York State General Business Law ("GBL") §§ 349 and 350.

9.    By offering for sale materially different gray market goods bearing the trademarks to which Plaintiffs have exclusive rights of distribution, Defendants infringe upon Plaintiffs' rights.

## JURISDICTION

10.    This Court has original jurisdiction pursuant to 15 U.S.C. §§ 1114 and 1121 (actions arising under the Trademark Act), and 28 U.S.C. §§ 1331, 1337, 1338(a) (acts of Congress relating to trademarks) and 1338(b) (pendant jurisdiction over state law claims) and 1367(a) (supplemental jurisdiction over state law claims).

## VENUE

11.    Venue is proper in this District pursuant to 28 U.S.C. §1391 (b) and (c) because a substantial part of the events or acts giving rise to the claim occurred in this District, a substantial part of the property that is the subject of the action is situated in this District and, upon information and belief, Defendants and their principals reside in this District.

## FIRST CAUSE OF ACTION
### False Association Pursuant to Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a)

**A. The HIT Trademarks and Plaintiffs' Exclusive Distribution Rights**

12.    Plaintiffs repeat, reiterate, and reallege each and every allegation set forth in the previous paragraphs as if fully set forth herein.

13.    Pursuant to a written agreement between Plaintiffs and Gaseosas Lux, N.A. ("Gaseosas"), a corporation formed and existing in the Country of Colombia, Plaintiffs have the exclusive rights for distribution of beverage goods manufactured by Gaseosas for sale in certain States in the United States (the "HIT Territory") under the label HIT (the "HIT Mark").

14.    Gaseosas is the owner of the entire right, title, and interest in the following valid, incontestable, and subsising Federal trademark registration: HIT Reg. No. 3,720,112.  A copy of said trademark registration is attached as Exhibit A.

15.    A Federal trademark registration is *prima facie* evidence of a registrant's exclusive right to use the registered trademark in commerce in connection with the goods or services specified in the certificate, pursuant to 15 U.S.C. §1057(b).

16.    Prior to Plaintiffs' engagement as the exclusive distributor for goods in the HIT Territory bearing the HIT Mark, there was virtually no market for goods bearing the HIT Mark.

17.    Plaintiffs have advertised, promoted and otherwise used the HIT Mark in commerce throughout the Territory, including this District.

18.    Plaintiffs have used the HIT Mark in interstate commerce, and have acquired valuable goodwill and recognition for the HIT Mark since approximately 2009.

19.    Due to Plaintiffs' use and promotion of the HIT Mark, the public has come to associate the HIT Mark with Plaintiffs' as a reputable and reliable seller of these quality beverage goods.

20.    Plaintiffs have created a market for goods bearing the mark.

21.    Over the past eleven (11) years Plaintiffs have established ongoing business relationships with over 1,300 retail establishments to which they sell goods bearing the HIT Mark for resale to the consumer.

22.    Plaintiffs have carefully monitored and policed the use of the HIT Mark.

**B. Defendants' Sale of Materially Different Goods**

23.    Upon information and belief, after Gaseosas's and Plaintiffs' adoption and use of the HIT Mark, the Defendants began selling, offering for sale, distributing, promoting and

advertising merchandise in the HIT Territory bearing the HIT Marks which were not authorized for sale in the U.S..

24.    Based on Plaintiffs' investigation to date, the Defendants have been engaged in a widespread, unlawful scheme of acquiring, selling, and distributing HIT goods which are manufactured by, or manufactured with the authority of, Gaseosas, but which are not authorized for sale within the HIT Territory.

25.    Goods which are sold within a territory in which they are not authorized for sale are considered "gray market" goods.

26.    Plaintiffs received information that Defendants were selling, offering for sale, and distributing, from their website for retail sales and warehouse for sale to retail outlets, materially different gray market goods bearing the HIT Mark.

27.    Plaintiffs engaged various employees to investigate Defendants' sale of materially different goods bearing the HIT Marks.

28.    Plaintiffs' employees engaged for this investigation were familiar with the various genuine HIT goods authorized for sale in the U.S. (the "U.S. Goods") so that they could identify the differences between the U.S. Goods and gray market goods.

29.    These employees viewed goods bearing the HIT Mark on Defendants' website and visited various retail outlets to which Plaintiffs regularly sold beverages bearing the HIT Mark.

30.    Upon inspection, Plaintiffs determined that while the goods were authentic, Gaseosas had not authorized them for sale in the United States, and they are therefore gray market goods (the "HIT Gray Market Goods").

31.    The employees inquired of the retailers as to the source of these HIT Gray Market Goods.

32.    The employees were informed by the retailers that they had purchased the HIT Gray Market Goods from Latinfood.

33.    The employees were informed by the retailers that Latinfood was selling the HIT Gray Market Goods at a price below that which the Plaintiffs sell the HIT U.S. goods.

34.    Invoices and purchase orders provided by certain retailers demonstrate that they received the HIT Gray Market Goods from defendant Latinfood.

35.    Markings on the shelf stickers of certain retailers also demonstrate that they received the HIT Gray Market Goods from defendant Latinfood.

36.    Upon information and belief, in order to hide its wrongful activities, Latinfood purchased a small amount of the HIT U.S. Goods from Plaintiff Iberia through Latinfood's affiliate, defendant J. Wilson.

37.    Upon information and belief, Defendants purchased the HIT U.S. Goods from Plaintiff Iberia in order to claim that they were selling legitimate HIT U.S. Goods to Plaintiffs' regular retail outlet customers.

38.    Plaintiffs employees purchased HIT Gray Market Goods bearing the HIT Mark from some of the retail outlets that purchased the HIT Gray Market Goods from Defendants.

39.    The goods purchased were not HIT U.S. Goods, but were goods manufactured in Colombia, but not authorized for sale in the U.S., being HIT Gray Market Goods.

40.    The goods purchased included HIT in juice boxes, which are not sold at all in the U.S.

41.    These HIT Gray Market Goods are materially different than the HIT U.S. Goods.

6

42.    Exhibit B, incorporated herein, displays a side by side comparison of a sample of Plaintiffs' HIT U.S. Goods exhibiting the HIT Marks and packaging and materially different HIT Gray Market Goods obtained by Plaintiffs from retail establishments that purchased the HIT Gray Market Goods from Defendants.

43.    Plaintiffs identified the HIT Gray Market Goods as being manufactured outside the U.S. and intended for sale outside the U.S., being sold under the HIT Mark.

44.    These HIT Gray Market Goods are materially different from the U.S. Goods authorized to be sold exclusively by Plaintiffs under the HIT Mark in the U.S.

45.    The HIT U.S. Goods are manufactured by Postobon S.A in a United States Food and Drug Administration ("FDA") certified facility.

46.    The HIT Gray Market Goods may be manufactured in a non-FDA certified facility.

47.    The HIT U.S. Goods are produced with the shelf life of 300 days.

48.    The HIT Gray Market Goods are produced with the shelf life of 163 days.

49.    The labels on the HIT U.S. Goods comply with FDA regulations.

50.    The HIT Gray Market Goods do not comply with FDA regulations.

51.    The labels on the HIT Gray Market Goods are primarily in Spanish, and not all statements are translated into English.

52.    Some of the HIT Gray Market Goods use ingredients different than the U.S. Goods.

53.    Some of the HIT Gray Market Goods use ingredients that are not approved for use in the U.S. by the FDA.

54.     Plaintiffs do not sell HIT in juice boxes in the U.S. because they do not meet Plaintiffs' minimal shelf life requirements.

55.     Defendants sell HIT Gray Market Goods in juice boxes in the U.S.

56.     Plaintiffs maintain superior quality control practices in their transportation warehousing, distribution and sale of the HIT U.S. Goods compared to those of the Defendants for the HIT Gray Market Goods.

57.     Plaintiffs maintain superior recall practices and oversight of the HIT U.S. Goods they sell compared to those of the Defendants for the HIT Gray Market Goods.

58.     In accordance with FDA regulations, Plaintiffs' name and address is printed on the label of all HIT U.S. Goods providing consumers with the assurance that a domestic company is responsible for the distribution and quality of the goods and the confidence that they stand behind the goods they sell should an issue arise.

59.     In violation of FDA regulations, the HIT Gray Market Goods do not print Defendants' name or address as the domestic company responsible for distribution, and in doing so may confuse the consumer into wrongly believing that these HIT Gray Market Goods, bearing the same Hit Mark, are supported and backed by Plaintiffs.

60.     Defendants willfully acquire, sell, and distribute these materially different HIT Gray Market Goods.

61.     Defendants will likely cause confusion to the consumer as to the affiliation or connection between the Defendants and their HIT Gray Market Goods and the Plaintiffs and their HIT U.S. Goods.

62.     Such consumer may likely assume that the HIT Gray Market Goods are being sold in the United States with the endorsement and approval of the Gaseosas and Plaintiffs.

63.    Defendants are thereby jeopardizing the goodwill and value associated with the HIT Marks in the U.S.

64.    These actions will continue to cause irreparable harm to the valuable and substantial goodwill associated with the HIT Marks in the U.S.

65.    Defendants' sale and distribution of HIT Gray Market Goods deprives Plaintiffs of sales and profits they would otherwise receive but for Defendants' unlawful conduct.

66.    Because Defendants' HIT Gray Market Goods are materially different from Plaintiffs' HIT U.S. Goods intended for sale in the U.S., including product characteristics and labeling, consumers may be disappointed or harmed by the HIT Gray Market Goods, resulting in a loss of goodwill and decreased demand for the HIT U.S. Goods over time.

67.    On information and belief, Defendants' have no present intention of terminating their sales of materially different HIT Gray Market Goods.

68.    As a direct and proximate result of the foregoing, Plaintiffs have suffered and, unless this Court enjoins Defendants' conduct, will continue to suffer actual economic damages in the form of lost sales, revenues, and profits, as well as immediate and irreparable reputational harm for which they have no adequate remedy at law.

69.    The harm of enjoining Defendants' infringement is minimal relative to the harm that would be caused to Plaintiffs if the infringement were allowed to continue.

70.    Accordingly, Defendants' must be enjoined from any further sale and distribution materially different goods bearing the HIT Mark.

## SECOND CAUSE OF ACTION
### False Advertising Pursuant to Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a)

71.    Plaintiffs repeat, reiterate, and reallege each and every allegation set forth in the previous paragraphs as if fully set forth herein.

9

72.    Defendants advertise the HIT Gray Market Goods for sale on their website.

73.    The display implies that Defendants have the right and authority to display the HIT Mark on a public forum and that they have the authority and endorsement from Gaseosas to sell these HIT Gray Market Goods.

74.    Defendants promote the HIT Gray Market Goods for sale to retail outlets.

75.    By such promotion Defendants falsely imply that Defendants have authority and endorsement from Gaseosas and Plaintiffs to sell these HIT Gray Market Goods.

76.    By such promotion Defendants falsely imply that the HIT Gray Market Goods are authorized for sale in the U.S.

77.    Defendants' misleading actions misrepresent the nature, characteristics and qualities, of their HIT Gray Market Goods.

78.    Such misleading actions have, and will continue to, damage Plaintiffs.

## THIRD CAUSE OF ACTION
## False Association Pursuant to Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a)

### C. The Pony Malta marks and Plaintiffs' Exclusive Distribution Rights

79.    Plaintiffs repeat, reiterate, and reallege each and every allegation set forth in the previous paragraphs as if fully set forth herein.

80.    Pursuant to a written agreement between Plaintiffs and Bavaria, S.A. ("Bavaria"), a corporation formed and existing in the Country of Colombia, Plaintiffs have the exclusive rights for distribution of beverage goods manufactured by Bavaria for sale in the United States in the states of New York, New Jersey and Florida (the "PM Territory") under the label Pony Malta (the "PM Mark").

81.    Upon information and belief, Bavaria has been selling goods in Colombia under the Pony Malta name since 1953.

82.    Upon information and belief, Bavaria has been selling, though U.S. distributors, goods in the U.S. under the Pony Malta name since at least 1985.

83.    The PM Mark is well known in Colombia and to the Colombian community in the U.S.

84.    On October 30, 1990 Bavaria obtained a Federal trademark for Pony Malta registered in the USPTO: HIT Reg. No. 1,620,274.  A copy of said trademark registration is attached as Exhibit C.

85.    On July 19, 2011 Bavaria obtained a Federal trademark for Pony Malta registered in the USPTO: HIT Reg. No. 3,997,475.  A copy of said trademark registration is attached as Exhibit D.

86.    On July 19, 2011 Bavaria obtained a Federal trademark for Pony Malta registered in the USPTO: HIT Reg. No. 3,997,484.  A copy of said trademark registration is attached as Exhibit E.

87.    A Federal trademark registration is *prima facie* evidence of a registrant's exclusive right to use the registered trademark in commerce in connection with the goods or services specified in the certificate, pursuant to 15 U.S.C. §1057(b).

88.    Due to an inadvertent failure to submit the appropriate renewal documentation, the trademark registrations were cancelled.

89.    Despite the trademark cancellations, Pony Malta has been continuously sold in the U.S.

90.    The PM Mark is registrable as a Federal trademark in the USPTO.

91.    Plaintiffs have advertised, promoted and otherwise used the PM Mark in commerce throughout the PM Territory, including this District.

92.     Plaintiffs have used the PM Mark in interstate commerce, and have acquired valuable goodwill and recognition for the PM Mark.

93.     The public has come to associate the PM Mark with Plaintiffs' as a reputable and reliable seller of these quality beverage goods.

94.     Since being appointed the exclusive distributor in the PM Territory Plaintiffs have established ongoing business relationships with over 1,100 retail establishments to which they sell goods bearing the PM Mark for resale to the consumer.

95.     Plaintiffs have carefully monitored and policed the use of the PM Mark.

**D. Defendants' Sale of Materially Different Goods**

96.     Upon information and belief, after Bavaria's and Plaintiffs' adoption and use of the PM Mark, the Defendants were selling, offering for sale, distributing, promoting and advertising merchandise in the PM Territory bearing the PM Marks which were not authorized for sale in the U.S.

97.     Based on Plaintiffs' investigation to date, the Defendants have been engaged in a widespread, unlawful scheme of acquiring, selling, and distributing Pony Malta goods which are manufactured by, or manufactured with the authority of, Bavaria, but which are not authorized for sale within the PM Territory.

98.     Plaintiffs received information that Defendants were selling, offering for sale, and distributing, from their website for retail sales and warehouse for sale to retail outlets, materially different gray market goods bearing the PM Mark.

99.     Plaintiffs engaged various employees to investigate Defendants' sale of materially different goods bearing the PM Marks.

100.    Plaintiffs' employees engaged for this investigation were familiar with the various genuine Pony Malta goods authorized for sale in the U.S. (the "PM U.S. Goods") so that they could identify the differences between the PM U.S. Goods and gray market goods.

101.    These employees viewed goods bearing the PM Mark on Defendants' website and visited various retail outlets to which Plaintiffs regularly sold beverages bearing the PM Mark.

102.    Upon inspection, Plaintiffs determined that while the goods were authentic, Bavaria had not authorized them for sale in the United States, and they are therefore gray market goods (the "PM Gray Market Goods").

103.    The employees inquired of the retailers as to the source of these PM Gray Market Goods.

104.    The employees were informed by the retailers that they had purchased the PM Gray Market Goods from Latinfood.

105.    The employees were informed by the retailers that Latinfood was selling the PM Gray Market Goods at a price below that which the Plaintiffs sell the PM U.S. goods.

106.    Invoices and purchase orders provided by certain retailers demonstrate that they received the PM Gray Market Goods from defendant Latinfood.

107.    Markings on the shelf stickers of certain retailers also demonstrate that they received the PM Gray Market Goods from defendant Latinfood.

108.    The employees purchased PM Gray Market Goods bearing the PM Mark from certain retail outlets.

109.    The employees purchased PM Gray Market Goods bearing the PM Mark from Defendants' website.

110.     Included in the PM Gray Market Goods purchased from Defendants' website was Pony Malta in polyethylene terephthalate ("PET") bottles, which are not sold at all in the U.S.

111.     Exhibit F, incorporated herein, is a side by side comparison of a sample of Plaintiffs' PM U.S. Products exhibiting the PM Marks and packaging and materially different PM Gray Market Goods obtained by Plaintiffs from retail establishments that purchased the PM Gray Market Goods from Defendants.

112.     Plaintiffs identified the PM Gray Market Goods as being manufactured outside the U.S. and intended for sale outside the U.S., being sold under the PM Mark.

113.     The PM Gray Market Goods are only sold by Bavaria for resale in Colombia.

114.     Upon information and belief, in order to circumvent Bavaria's restriction on sale of the PM Gray Market Goods outside of Colombia, they purchase the PM Gray Market Goods through a Colombian company, Two Way Solutions.

115.     On their website Defendants display that one of their "Providers" is Bavaria.

116.     Bavaria does not provide Defendants with their PM Gray Market Goods, which are purchased through Two Way Solutions to enable Defendants to conceal from Bavaria the fact that the goods are bound for sale in the U.S.

117.     These PM Gray Market Goods are materially different from the PM U.S. Goods authorized to be sold exclusively by Plaintiffs under the PM Mark in the U.S.

118.     PM U.S. Goods undergo a specific security and quality control process that differs from the security and quality control process applied to PM Gray Market Goods.

119.     PM U.S. Goods are stabilized to have enough shelf-life for quality control requirements, being at least twelve (12) months.

120.    Some of the PM Gray Market Goods, such as those sold in PET bottles, do not meet that requirement, only having a three (3) month shelf life.

121.    The labels on the genuine PM U.S. Goods comply with FDA regulations.

122.    The labels on the PM Gray Market Goods do not comply with FDA regulations.

123.    The PM Gray Market Goods have ingredients and nutritional information on a label around the neck of the bottle solely in Spanish.

124.    The neck label of the U.S. PM Goods notes that the product is specifically made for export.

125.    Defendants have placed an ingredient and nutritional information label onto the back of the PM Gray Market Goods.

126.    The label placed on the back of the PM Gray Market Goods is not FDA compliant.

127.    The nutritional information on the label placed on the back of the PM Gray Market Goods by Defendants is different than the nutritional information placed on the neck label of the same bottle by Bavaria.

128.    If the neck label in Spanish, which was applied by Bavaria, is correct then the label placed on the back of the PM Gray Market Goods by Defendants provides false nutritional information.

129.    Plaintiffs maintain superior quality control practices in their transportation warehousing, distribution and sale of the PM U.S. Goods compared to those of the Defendants for the PM Gray Market Goods.

130.    Many of these quality control practices are required by Bavaria in order for Plaintiffs to maintain their exclusive distribution rights.

131.    Plaintiffs maintain superior recall practices and oversight of the PM U.S. Goods they sell compared to those of the Defendants for the PM Gray Market Goods.

132.    In accordance with FDA regulations, Plaintiffs' name and address is printed on the label of all U.S. Goods providing consumers with the assurance that a domestic company is responsible for the distribution and quality of the goods and the confidence that they stand behind the goods they sell should an issue arise.

133.    In violation of FDA regulations, the PM Gray Market Goods do not print defendants name or address as the domestic company responsible for distribution, and in doing so may confuse the consumer into wrongly believing that these Gray Market Goods, bearing the same PM Mark, are supported and backed by Plaintiffs.

134.    Defendants willfully acquire, sell, and distribute these materially different PM Gray Market Goods.

135.    Defendants will likely cause confusion to the consumer as to the affiliation or connection between the Defendants and their PM Gray Market Goods and Plaintiffs and their PM U.S. Goods.

136.    Such consumer may likely assume that the PM Gray Market Goods are being sold in the U.S. with the endorsement and approval of the Bavaria and Plaintiffs.

137.    Defendants are thereby jeopardizing the goodwill and value associated with the PM Marks in the U.S.

**E.  Defendants Violate Bottle Return Law**

138.    Pony Malta products are subject to the New York State Returnable Container Act (the "Bottle Bill"), Environmental Conservation Law ("ECL"), Sections 27-1001 et. seq. and its regulations, 6 NYCRR Part 367.

139.     The Bottle Bill requires those who first import or distribute beverages (the "Deposit Initiator") which are subject to the Bottle Bill to collect a deposit of no less than five cents per bottle (the "Bottle Deposit") and to create a fund into which the Bottle Deposit is to be placed (the "Deposit Fund").

140.     The Bottle Bill requires that all bottles returned by consumers be redeemed for five cents.

141.     Ultimately, the bottle redemptions are funded by the Deposit Fund.

142.     The Bottle Bill requires that eighty (80%) percent of the unredeemed Deposit Fund each quarter be paid to the State of New York (the "State Portion").

143.     The Bottle Bill permits the Deposit Initiator to retain twenty (20%) percent of the unredeemed Deposit Fund each quarter (the "Distributor Portion").

144.     Defendants are the Deposit Initiator of the PM Gray Market Goods.

145.     Defendants are required to collect the Bottle Deposit and to place the moneys in the Deposit Fund.

146.     Upon information and belief, Defendants are not collecting the Bottle Deposit when selling the PM Gray Market Goods.

147.     By not collecting the Bottle Deposit, Defendants are able to charge lower prices for the PM Gray Market Goods than plaintiffs can charge for the U.S. Goods.

148.     Upon information and belief, Defendants are not funding the Deposit Fund.

149.     Upon information and belief, Defendants are not redeeming the returned PM Gray Market Goods.

150.     Plaintiffs, being the appointed exclusive distributors of Pony Malta, are the Deposit Initiator for legitimate Pony Malta goods in New York.

151.    Plaintiffs did not sell PM Gray Market Goods, did not collect the Bottle Deposit from the sale of the PM Gray Market Goods, are therefore not required to redeem returned PM Gray Market Goods.

152.    If Plaintiffs redeem the PM Gray Market Goods, it will necessarily reduce the Plaintiffs' Deposit Fund for bottles not sold by Plaintiffs and for which no Bottle Deposit was collected.

153.    As a result, the State of New York would not receive the appropriate State Portion.

154.    As a result, Plaintiffs would not retain the appropriate Distributor Portion.

155.    If Plaintiffs refuse to redeem the PM Gray Market Goods, those consumers will not recognize the distinction between the different goods or recognize Plaintiffs' rightful refusal to redeem the PM Gray Market Goods

156.    Plaintiffs' rightful refusal to redeem PM Gray Market Goods will affect the good will of Plaintiffs concerning the PM U.S. Goods.

157.    These actions will continue to cause irreparable harm to the valuable and substantial goodwill associated with the PM Marks in the U.S.

158.    Defendants' sale and distribution of PM Gray Market Goods deprives Plaintiffs of sales and profits they would otherwise receive but for Defendants' unlawful conduct.

159.    Because Defendants' PM Gray Market Goods are materially different from Plaintiffs' PM U.S. Goods intended for sale in the U.S., including product characteristics and labeling, consumers may be disappointed or harmed by the PM Gray Market Goods, resulting in a loss of goodwill and decreased demand for the PM U.S. Goods over time.

160.    Upon information and belief, Defendants' have no present intention of terminating their sales of materially different PM Gray Market Goods.

161.    As a direct and proximate result of the foregoing, Plaintiffs have suffered and, unless this Court enjoins Defendants' conduct, will continue to suffer actual economic damages in the form of lost sales, revenues, and profits, as well as immediate and irreparable reputational harm for which they have no adequate remedy at law.

162.    The harm of enjoining Defendants' infringement is minimal relative to the harm that would be caused to Plaintiffs if the infringement were allowed to continue.

163.    Accordingly, Defendants' must be enjoined from any further sale and distribution materially different goods bearing the PM Mark.

## FOURTH CAUSE OF ACTION
## False Advertising Pursuant to Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a)

164.    Plaintiffs repeat, reiterate, and reallege each and every allegation set forth in the previous paragraphs as if fully set forth herein.

165.    Defendants advertise the PM Gray Market Goods for sale on their website.

166.    Defendants advertise that Bavaria is one if the Defendants' "Providers".

167.    The display implies that Defendants have the right and authority to display the PM Mark on a public forum and that they have the authority and endorsement from Bavaria to sell these goods.

168.    Defendants promote the PM Gray Market Goods for sale to retail outlets.

169.    By such promotion Defendants falsely imply that Defendants have authority and endorsement from Bavaria and Plaintiffs to sell these goods.

170.    By such promotion Defendants falsely imply that the PM Gray Market Goods are authorized for sale in the U.S.

171.    Defendants' misleading actions misrepresent the nature, characteristics and qualities, of their PM Gray Market Goods.

172.    Such misleading actions have, and will continue to, damage Plaintiffs.

**FIFTH CAUSE OF ACTION**
**COMMON LAW UNFAIR COMPETITION**

173.    Plaintiffs repeat, reiterate, and reallege each and every allegation set forth in the previous paragraphs as if fully set forth herein.

174.    The aforesaid actions by Defendants constitute bad faith.

175.    The acts of Defendants complained of herein constitute unfair competition in violation of the common law of the State of New York.

176.    As a result Plaintiffs are entitled to damages including, but not limited to, the profit derived by Defendants thereby.

**SIXTH CAUSE OF ACTION**
**TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE**

177.    Plaintiffs repeat, reiterate, and reallege each and every allegation set forth in the previous paragraphs as if fully set forth herein.

178.    Plaintiffs had a regular business relationship with numerous retail outlets' purchase of the HIT U.S. Goods and PM U.S. Goods (collectively the "U.S. Goods) for resale to consumers.

179.    Defendants have interfered with Plaintiffs' regular business relationships with these retail outlets by selling to them PM Gray Market Goods and HIT Gray Market Goods (collectively the "Gray Market Goods") in place of the legitimate U.S. Goods previously sold to them.

180.    Defendants used dishonest and unfair and improper means in selling the Gray Market Goods which are not authorized to be sold in the U.S. and are materially different than the U.S. Goods and likely to cause consumer confusion.

181.    As a result of the wrongful acts of Defendants these regular customers of Plaintiffs no longer purchase the U.S. Goods from Plaintiffs, instead purchasing the Gray Market Goods from Defendants.

182.    As a result Plaintiffs are entitled to damages including, but not limited to, the profit derived by Defendants thereby.

**SEVENTH CAUSE OF ACTION**
**VIOLATION OF NEW YORK GENERAL BUSINESS LAW §349**

183.    Plaintiffs repeat, reiterate, and reallege each and every allegation set forth in the previous paragraphs as if fully set forth herein.

184.    NY GBL § 349 provides that "deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state are . . . unlawful."

185.    Defendant's business act and practices and/or omissions as alleged herein constitute deceptive acts or practices under NY GBL § 349, which were enacted to protect the consuming public from those who engage in unconscionable, deceptive, and unfair acts or practices in the conduct of any business, trade, or commerce.

186.    Defendant's practices described throughout this Complaint, were specifically directed to consumers.

187.    The practices employed by Defendants, whereby Defendants advertise, promote, and markets their Gray Market Goods displaying the HIT Mark and PM Mark which products were not authorized for sale in the U.S., are materially different than the legitimate U.S. Goods,

have differing quality control and are not FDA compliant, are unfair, deceptive, and misleading and are in violation of NY GBL § 349.

188.    Defendants will likely cause confusion to the consumer as to the affiliation or connection between the Defendants and their Gray Market Goods and the Plaintiffs and their U.S. Goods.

189.    Such consumer may likely assume that the Gray Market Goods are being sold in the United States with the endorsement and approval of Gaseosas, Bavaria and Plaintiffs.

190.    Defendants' deceptive practices were knowing and willful.

191.    Defendants' actions impact the public interest because this deception is directed to the purchasing consumer.

192.    The foregoing deceptive acts and practices proximately caused actual damages.

193.    Plaintiff is entitled to recover compensatory damages, statutory damages, attorneys' fees and costs, and any other relief the Court deems appropriate.

194.    Defendant should be enjoined from any further sale and distribution of the materially different goods bearing the HIT Mark and the PM Mark. Plaintiff, respectfully demands a judgment enjoining Defendant's conduct, awarding costs of this proceeding and attorneys' fees, as provided by NY GBL § 349, and such other relief as this Court deems just and proper.

## EIGHTH CAUSE OF ACTION
## VIOLATION OF NEW YORK GENERAL BUSINESS LAW §350

195.    Plaintiffs repeat, reiterate, and reallege each and every allegation set forth in the previous paragraphs as if fully set forth herein.

196.    Defendants have been and/or are engaged in the "conduct of … business, trade or commerce" within the meaning of N.Y. GBL § 350.

197.    New York GBL § 350 makes unlawful "[f]alse advertising in the conduct of any business, trade or commerce."

198.    False advertising includes "advertising, including labeling, of a commodity … if such advertising is misleading in a material respect," taking into account "the extent to which the advertising fails to reveal facts material in light of … representations [made] with respect to the commodity …" N.Y. GBL § 350-a(1).

199.    Defendants caused to be disseminated throughout New York, through advertising, marketing and labeling, statements that were untrue and/or misleading.

200.    The practices employed by Defendant, whereby Defendant advertises, promotes, and markets its Gray Market Goods displaying the HIT Mark and PM Mark which products was not authorized for sale in the U.S., are materially different than legitimate U.S. Goods, have differing quality control and are not FDA compliant are unfair, deceptive, and misleading and are in violation of NY GBL § 350.

201.    Consumers purchasing the Gray Market Goods were, and continue to be, exposed to Defendants' material deceptions.

202.    The aforementioned practices are likely to deceive a reasonable consumer.

203.    Plaintiffs have suffered an injury, including the loss of money or property, as a result of Defendants' false and misleading advertising.

204.    Pursuant to N.Y. GBL § 350-e, Plaintiffs seek monetary damages (including actual damages and minimum, punitive, or treble and/or statutory damages pursuant to GBL § 350-a(1)), injunctive relief, restitution and disgorgement of all monies obtained by means of Defendants' unlawful conduct, interest, and attorneys' fees and costs.

**SIXTH CAUSE OF ACTION**
**ACCOUNTING**

205.    Plaintiffs repeat, reiterate, and reallege each and every allegation set forth in the previous paragraphs as if fully set forth herein.

206.    Plaintiffs seek an accounting of the sales and profits generated from it wrongful activities.

**DEMAND FOR JURY TRIAL**

Pursuant to Federal Rule of Civil Procedure 38, Plaintiffs hereby demand a trial by Jury on all issues triable of right by a Jury.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully requests that the Court order the following relief:

A.  On the First Cause and Second Cause of Action, that pursuant to 15 U.S.C. § 1125, and the equity jurisdiction of this court, Defendants and their officers, agents, employees, representatives, and all persons in privity therewith be permanently enjoined and restrained from using on or in connection with the importation, sale, offering for sale, distribution, exhibition, display or advertising of their goods bearing the HIT Mark, or any other marks or symbols which are confusingly or deceptively similar to, or colorably imitative of the HIT Mark;

B.  On the Third Cause and Fourth Cause of Action, that pursuant to 15 U.S.C. § 1125, and the equity jurisdiction of this court, Defendants and their officers, agents, employees, representatives, and all persons in privity therewith be permanently enjoined and restrained from using on or in connection with the importation, sale, offering for sale, distribution, exhibition, display or advertising of their goods bearing

the PM Mark, or any other marks or symbols which are confusingly or deceptively similar to, or colorably imitative of the PM Mark.

C.  On the Fifth Cause of Action, for damages including, but not limited to, the profit derived by Defendants;

D.  On the Sixth Cause of Action, for damages including, but not limited to, the profit derived by Defendants;

E.  On the Seventh and Eighth Cause of Action, Defendant, Defendants and their officers, agents, employees, representatives, and all persons in privity therewith be permanently enjoined and restrained from using on or in connection with the importation, sale, offering for sale, distribution, exhibition, display or advertising of their goods bearing the HIT Mark or PM Mark, or any other marks or symbols which are confusingly or deceptively similar to, or colorably imitative of the HIT Mark or PM Mark; awarding costs of this proceeding and attorneys' fees and statutory damages as provided by NY GBL §§ 349 and 350, and such other relief as this Court deems just and proper;

F.  On the Ninth Cause of Action, for an accounting.

G.  Such other and further relief as this court deems just

Dated: New York, New York
       June 26, 2020

                                           ____/s/__Jeffrey C. Ruderman_____
                                           Jeffrey C. Ruderman, Esq.    (JR-7812)
                                           Cyruli Shanks Hart & Zizmor, LLP.
                                           Attorneys for Plaintiff
                                           420 Lexington Avenue-Ste 2320
                                           New York, New York 10170
                                           (212) 661-6800

STATE OF *Florida* )
                                    ) ss.:
COUNTY OF *Miami-Dade* )


      Deponent is the Director of Business Development of Iberia Foods Corp., North Shore Bottling Co., Inc., Brooklyn Bottling Of Milton, New York, Inc. and International World Foods Corp., Plaintiffs in the within action, that deponent has read the Complaint herein, and is familiar with the contents thereof; that the statements contained therein are true to deponent's own knowledge, except as to the matters stated to be alleged upon information and belief, and that as to those matters deponent believes it to be true. The grounds of deponent's belief as to all matters not stated upon deponent's knowledge are as follows:

BOOKS AND RECORDS.

_____
    DONALD LUTCHMAN


Sworn to before me this
___ day of June, 2020

_____
Notary Public